## Cavanagh v. Bone Stadium, Inc.

Before Valentine, P. J., Lewis and Pinola, JJ.

*James P. Harris, Jr.*, for plaintiff.

*J. Earl Langan*, for defendant.

PINOLA, J., November 2, 1953.—Plaintiff has sued defendant in trespass for the loss of her car which was stolen at a parking lot operated by defendant in conjunction with an automobile race track near Pittston.

Defendant has filed preliminary objections in the nature of a demurrer, contending (1) that the com-

plaint fails to state a cause of action, and (2) that the action is not maintainable.

Three alternative causes are set forth. The first is based upon conversion, and plaintiff's counsel frankly admits that it cannot be sustained. The second is based on alleged negligence in the performance of a duty arising out of an implied contract to see that the car was not molested, and the third alleges a bailment.

It appears that on April 29, 1951, at about 2 p.m., plaintiff loaned her car to one Peter Becker, who attended the races at Bone's Stadium. He parked the car in the parking lot of defendant and, as plaintiff avers, "locked said automobile, and removed the keys thereto, and paid the sum of twenty-five (25c) cents to an agent and employe of the defendant, who was in charge of the parking lot, as consderation for the privilege of parking the automobile in said lot."

The theft of the car was discovered about 5 p.m., when Peter Becker returned for the car and it was gone. In the second alternative cause plaintiff declares:

Paragraph 10:

"Defendant held out to the public, including the plaintiff and plaintiff's bailee, Peter Becker, that it was equipped safely to guard any auto parked therein, and that it, the defendant, had in charge of said parking lot capable employees, honest and diligent in caring for and watching automobiles parked in said lot, to see that they were not stolen or broken into."

Paragraph 11:

"Defendant held out to the public, including the plaintiff and said Peter Becker that the said parking lot was a safe place to park said automobile and that said parking lot would be adequately policed by the defendant's servants or employes."

Paragraph 12:

"Implied terms of the contract for the parking of

plaintiff's automobile, as aforesaid, was that said parking lot was a safe place wherein plaintiff's automobile could be parked and that defendant would properly police the said premises and keep proper watch on plaintiff's automobile."

Plaintiff contends that the automobile was stolen through the negligence of defendant in the respects set forth in paragraph 14.

In the third alternative cause of action she declares:

Paragraph 17:

"Defendant undertook, for the consideration paid by the plaintiff, to keep securely plaintiff's automobile, possession of which had been delivered to the defendant as above alleged, and to return said automobile to said Peter Becker on demand."

## Discussion

This is a case of first impression. There are many cases in our State in which the keys to the car were left in it at the time of parking. This is the first instance in which the keys were taken from the ignition, the body locked, and the keys kept by the owner.

The decided cases recognize two principal classes of legal relationships in dealing with the present-day type of parking lot. The first is where an owner merely rents space in a parking lot, drives his automobile therein, locks it or not as he chooses and for all practical purposes retains control thereof. Such transactions have commonly been held to be that of a mere lease or license, because the owner has paid a fee only for the privilege of parking his automobile, without actual delivery to the parking lot operator and with no corresponding right to redelivery.

The second is where the attendants collect fees, assume control of cars, sometimes parking them, moving them about where keys are left at request and tickets are issued as means of identifying cars upon re-

delivery. In such instances, the transactions have been held to constitute a bailment and the lot owner held responsible for loss of the car or damage to it: Quinn v. Milner, to use of Hartford Fire Ins. Co., M. C. of Appeals for the Dist. of Columbia, 34 A. 2d 259. See also extensive annotation containing numerous decisions in 131 A. L. R. 1175.

Here the custodian of the car paid a fee, then locked it and removed the keys, thereby excluding the lot owner as well as all other persons from the car and its movement. Under such circumstances, one of the essential elements of a bailment is missing, namely, the delivery of the car and its acceptance by the supposed bailee. We realize that a locked trunk may be delivered to a bailee because in its locked condition it may be moved and transported by the bailee, but we submit that a car which is locked is not in the same category.

Where the key is left in the car there is actual delivery; but where an automobile is locked, it is held in most of the reported cases in other States that the lot owner merely lets parking privileges and is not a bailee of the car, and consequently he is under no duty to guard against loss by theft: 4 Williston on Contracts (rev. ed.) 2960, sec. 1065(a).

The pleadings do not reveal whether the lot was fenced or unfenced, and no parking ticket was given.

Where the lot is unfenced, no ticket is given, and no redelivery intended, the writer in 24 Am. Jur. 493, §29, has pointed out a distinction which is observed between city parking lots and parking areas adjacent to baseball grounds. He writes:

"It has been held that there is a mere rental of space and no bailment where a car owner leaves his car in an outdoor parking place adjacent to a baseball field, although a small charge is made for the privilege

and a couple of employees are present to collect the charges and look after the cars. The familiar uninclosed fields adjacent to many ball parks and other such places where automobiles are parked are entirely different from the well-ordered stations found in the downtown sections of cities. In such parking spaces large numbers of cars arrive and leave about the same time. A surrender of possession of each car to the proprietor of the station, to be redelivered to the rightful owner, would call for a force of employees or a resort to a system of multiple checks to identify the car and the driver when taken from the parking ground and would result in delay, annoyance, additional expense, and in the defeat of the very convenience which such a station provides for the public. Consequently, in the case of parking stations adjacent to ball parks, there is no express or implied contract on the part of the proprietor thereof to maintain a watch against the theft of cars."

While a contract of bailment may be implied, such contract can arise only where the natural and just interpretation of the acts of the parties warrants such conclusion; and no bailment can be implied where it appears that it was the intention of the parties, as derived from their relationship to each other, and from the other circumstances of the case, that the property was to be held by the party in possession in some capacity other than as bailee: 8 C. J. S. 247, §14.

Here there was no bailment. Defendant simply sold a parking privilege, and therefore, it is not liable to the owner of the automobile for its loss.

Accordingly, we enter the following

*Order*

Now, November 2, 1953, at 9:30 a.m., the preliminary objections are sustained and judgment is entered in favor of defendant.